609 A.2d 11

JAMES HENNESSEY, PLAINTIFF–APPELLANT,
v. COASTAL EAGLE POINT OIL COMPANY,
DEFENDANT–RESPONDENT.

Argued January 22, 1992—Decided July 20, 1992.

*James Katz* argued the cause for appellant (*Tomar, Simonoff, Adourian & O'Brien,* attorneys).

*Lawrence S. Coburn,* a member of the Pennsylvania bar, argued the cause for respondent (*Green, Lundgren & Ryan,* attorneys; *Peter P. Green,* on the brief).

*Eric Neisser* argued the cause for *amicus curiae* American Civil Liberties Union.

*Susan Remis Silver,* Assistant Deputy Public Advocate, argued the cause for *amicus curiae* Department of the Public Advocate (*Wilfredo Caraballo,* Public Advocate, attorney).

*Paul I. Weiner* argued the cause for *amicus curiae* Employment Law Council (*Timins & Weiner,* attorneys).

*Peter T. Manzo* submitted a letter in lieu of brief on behalf of *amici curiae* Washington Legal Foundation and Parents' Association to Neutralize Drug and Alcohol Abuse.

*Christopher H. Mills* and *Douglas S. McDowell,* a member of the District of Columbia bar, submitted a brief on behalf of *amicus curiae* Equal Employment Advisory Council.

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal questions whether a private employer's discharge of an employee who had failed a mandatory random drug test

violated a clear mandate of public policy, and thus was compensable as a wrongful discharge. See *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 417 *A.*2d 505 (1980). The trial court found a clear mandate of public policy against private random drug testing in the search-and-seizure provision of New Jersey's Constitution, and therefore granted plaintiff's motion for summary judgment. The Appellate Division reversed, 247 *N.J.Super.* 297, 589 *A.*2d 170 (1991). We granted certification, 126 *N.J.* 340, 598 *A.*2d 897 (1991), and now affirm.

I

Plaintiff, James Hennessey, was an at-will employee of defendant, Coastal Eagle Point Oil Company (Coastal Eagle), in Westville, New Jersey, working in an oil refinery as a lead pumper. He supervised the "gaugers," whose duties include blending gasoline with additives and managing the flow of gasoline products through the refinery. A gauger functions only under the direction of the lead pumper, who must translate orders and instructions into gauge levels for the gaugers. The lead pumper's job requires an ability to make precise calculations, to interpret orders and convey them to the gaugers, and to keep accurate records for the next shift's lead pumper.

The refinery functions twenty-four hours a day, seven days a week, on three shifts: 7:00 a.m. to 3:00 p.m., 3:00 p.m. to 11:00 p.m., and 11:00 p.m. to 7:00 a.m. As is true of many of the refinery's employees, Hennessey worked all three shifts on a rotating schedule. Michael J. Hoey, Coastal Eagle's manager of employee relations, described the position as a "very responsible" one. Irving Turner, Hennessey's immediate supervisor, evaluated plaintiff's work as "above average," noting that his job "always got done well."

Coastal Eagle acquired the refinery from Texaco (which had no written employee-drug-testing policy) in 1985. After the takeover, Coastal Eagle conducted physical examinations, including drug tests, on all its employees. (It regarded those

examinations as pre-employment physicals.) Over nineteen percent of the employees tested positive for drug use. (Hennessey tested negative for the presence of drugs in that examination.) On June 21, 1985, Coastal Eagle issued a written policy and accompanying memorandum in which the company prohibited the on-premises use of alcohol, drugs, or controlled substances; required employees to notify their supervisors of their use of any drug or medication that was "known or advertised as possibly affecting or impairing" judgment or job performance; and warned employees that they might "at any time be required to give a urine or blood sample in order to determine compliance with the policy," and that noncompliance with the policy might result in termination. Coastal Eagle also announced a policy under which it would encourage and help employees who voluntarily disclosed drug problems to seek rehabilitation.

In January 1986, after discovering evidence of on-site marijuana use, the company decided to conduct random urine testing that spring (without notifying the employees that the tests would be conducted or describing the methodology that would be used in testing). Coastal Eagle included several features in the testing program to ensure minimum intrusion and maximum accuracy: the company chose urinalysis rather than blood-testing after concluding that the former method was less intrusive; an observer monitored the employee while giving the sample to avoid submission of counterfeit samples; steps were taken to ensure that the testing was truly random; the urine samples were tested only for drugs and not for any other physiological characteristics; and the most accurate testing methodology was used, with positive results being confirmed by a different test. At the same time the company also rescinded its informal policy of allowing employees who had tested positive to avoid termination by entering a rehabilitation program. The company notified supervisors of the change through a directive that was not distributed to non-management employees. The refinery's management expected that employees

would receive notice of the change through the chain of command.

Hennessey, a non-management employee, was randomly chosen on June 9, 1986, for testing, and his urine yielded a positive result for marijuana and diazepam, which is the active ingredient in the tranquilizer Valium. Plaintiff neither challenges the accuracy of the test result nor contends that he was taking the diazepam for medical reasons. Coastal Eagle dismissed Hennessey, who thereafter brought this suit. His complaint included six counts: (1) wrongful discharge in violation of public policy, as provided by *Pierce, supra,* 84 *N.J.* 58, 417 *A.*2d 505; (2) common-law invasion of privacy; (3) violation of New Jersey's constitutional right of privacy as provided by article I, paragraphs 1 ("natural and unalienable rights") and 7 (search and seizure); (4) violation of New Jersey's Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42; (5) breach of contract; and (6) negligent or intentional infliction of emotional distress. The parties stipulated to dismissal of Count Four.

On cross-motions for summary judgment the Law Division granted plaintiff's motion, based on his wrongful-discharge claim. The trial court found a public policy applicable to private employers in *Fraternal Order of Police v. City of Newark,* 216 *N.J.Super.* 461, 474, 524 *A.*2d 430 (App.Div.1987), in which the court had held that the City of Newark may conduct drug testing of police officers only with reasonable individualized suspicion of drug use. As had the Appellate Division in *Fraternal Order of Police,* the trial court here based its opinion entirely on article I, paragraph 7 of the New Jersey Constitution—the Search and Seizure Clause. The court found that *Fraternal Order of Police* and *Allen v. Passaic County,* 219 *N.J.Super.* 352, 530 *A.*2d 371 (Law Div.1986) (requiring reasonable suspicion for drug-testing of sheriff's-office personnel), provided "clear expressions of New Jersey public policy regarding drug screening." The court dismissed the remaining counts.

In reversing, the Appellate Division held that because "[p]rivate action does not violate constitutional prohibitions against unreasonable searches," 247 *N.J.Super.* at 305, 589 *A.*2d 170, random drug testing by private employers does not violate a clear mandate of public policy and therefore cannot form the basis of a wrongful-discharge claim. Explaining that privacy is "too amorphous" a standard to form the basis for a clear mandate of public policy, *id.* at 308, 589 *A.*2d 170, the court remanded to the trial court for determination of the remaining counts of Hennessey's complaint.

We affirm the Appellate Division's judgment and hold that Coastal Eagle's firing of Hennessey, an at-will employee in a safety-sensitive position, as a result of his failing a random urine test did not violate a clear mandate of public policy.

## II

The traditional common-law rule was that an employer could fire an at-will employee "for good cause, for no cause, or even for cause morally wrong * * *." *Payne v. Western & Atl. R.R. Co.,* 81 *Tenn.* 507, 519–20 (1884), *overruled on other grounds, Hutton v. Watters,* 132 *Tenn.* 527, 179 *S.W.* 134 (1915), *quoted in* Lawrence E. Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 *Colum.L.Rev.* 1404, 1405 & n. 10 (1967). However, starting in 1959, courts across the country began to hold that firing an employee for "bad cause" might be actionable. *See Petermann v. International Bhd. of Teamsters, Local 396,* 174 *Cal.App.*2d 184, 344 *P.*2d 25, 27 (1959) (finding public-policy exception to at-will-employment rule when employee had been fired for refusing to commit perjury).

This Court first recognized a cause of action for wrongful discharge in 1980. See *Pierce, supra,* 84 *N.J.* 58, 417 *A.*2d 505. The defendant in *Pierce,* Ortho Pharmaceutical Corp., had employed the plaintiff, Dr. Grace Pierce, as an at-will employee in a high-level research position. She was the only medical

doctor working on a project to develop loperamide, an anti-diarrhea drug. As part of the testing and research procedure, Ortho decided to file an investigational-new-drug application (IND) with the Federal Food and Drug Administration (FDA). Dr. Pierce, who disapproved of the research because in Ortho's proposed formulation loperamide would contain saccharin, wrote a memorandum in which she declared her opposition to continuing with the research; she believed that even seeking FDA permission to proceed was unjustified. She expressed that opposition to her immediate supervisor, who removed her from the loperamide project and asked her to choose other projects.

Viewing the transfer as a demotion, Dr. Pierce resigned and sued Ortho, claiming that she had been terminated for refusing to support an action that violated her interpretation of the Hippocratic oath. (She did not allege that continued testing would violate State or federal law.) The trial court granted summary judgement for Ortho, reasoning that an employer may fire an at-will employee for any reason. The Appellate Division reversed. 166 *N.J.Super.* 335, 399 *A.*2d 1023 (1979).

This Court reversed, but in so doing narrowed the scope of an employer's authority to fire an at-will employee: we held that "an employee has a cause of action for wrongful discharge when the discharge is *contrary to a clear mandate of public policy." Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505 (emphasis added). The Court continued:

> An employer's right to discharge an employee at will carries a correlative duty not to discharge an employee who declines to perform an act that would require a violation of a clear mandate of public policy. However, unless an employee at will identifies a specific expression of public policy, he may be discharged with or without cause.
>
> [*Ibid.*]

In applying its new rule, the Court found no violation of a clear mandate of public policy. *Id.* at 73–76, 417 *A.*2d 505. The only source of public policy on which Dr. Pierce had relied was the Hippocratic oath. Clinical testing of the loperamide was not imminent; indeed, it was contingent on the FDA's approval

of Ortho's IND. Nor did Dr. Pierce allege that Ortho would have proceeded without FDA approval. In sum, one doctor acting according to the dictates of her conscience was not sufficient to constitute a "clear mandate of public policy." *Id.* at 75, 417 *A.*2d 505. "As a matter of law, there is no public policy against conducting research on drugs that may be controversial, but potentially beneficial to mankind, particularly where continuation of the research is subject to approval by the FDA." *Id.* at 76, 417 *A.*2d 505.

## III

### A

The sources of public policy are varied. In *Pierce, supra,* we stated:

> The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy. However, not all such sources express a clear mandate of public policy. * * * Absent legislation, the judiciary must define the cause of action in case-by-case determinations.

[84 *N.J.* at 72, 417 *A.*2d 505.]

This state's courts have found a wrongful-discharge cause of action to exist when based on a clearly-articulated public policy. See, *e.g., Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 192–93 & n. 1, 536 *A.*2d 237 (1988) (plaintiff had requested access to employment records to establish gender discrimination claim; Court found clear mandate of public policy in federal case law); *Lally v. Copygraphics,* 85 *N.J.* 668, 670, 428 *A.*2d 1317 (1981) (plaintiff had filed Worker's Compensation claim; Court found clear mandate of public policy derived from statute); *Potter v. Village Bank,* 225 *N.J.Super.* 547, 560, 543 *A.*2d 80 (App.Div.) (plaintiff bank-president had reported to Banking Commission suspected money-laundering by bank directors; court derived clear mandate of public policy from statute), *certif. denied,* 113 *N.J.* 352, 550 *A.*2d 462 (1988); *Cerracchio v. Alden Leeds, Inc.,* 223 *N.J.Super.* 435, 445, 538

A.2d 1292 (App.Div.1988) (plaintiff had filed complaint with OSHA; court found clear mandate of public policy in "legislation"); *Kalman v. Grand Union Co.*, 183 *N.J.Super.* 153, 157–59, 443 *A.*2d 728 (App.Div.1982) (plaintiff-pharmacist had refused to close pharmacy on July 4; court derived clear mandate of public policy from case law, administrative regulations, and code of ethics); *cf. Lepore v. National Tool and Mfg. Co.*, 224 *N.J.Super.* 463, 473–74, 540 *A.*2d 1296 (App.Div.1988) (extending protection of at-will employees to employees covered by collective-bargaining agreements; employee had been fired for reporting safety violations to OSHA), *aff'd*, 115 *N.J.* 226, 557 *A.*2d 1371, *cert. denied*, 493 *U.S.* 954, 110 *S.Ct.* 366, 107 *L.Ed.*2d 353 (1989).

When the plaintiff does not show a violation of a clearly-established right, however, there is no wrongful-discharge cause of action. Our courts have denied recovery to an employee who claimed that his firing for following his conscience violated a clear mandate of public policy. See *House v. Carter-Wallace, Inc.*, 232 *N.J.Super.* 42, 51, 556 *A.*2d 353 (App.Div.) (plaintiff had voiced internal opposition to distribution of contaminated tooth polish; court suggested that outcome might have been different had plaintiff complained to governmental, or other outside, authority), *certif. denied*, 117 *N.J.* 154, 564 *A.*2d 874 (1989); *see also Citizens State Bank v. Libertelli*, 215 *N.J.Super.* 190, 196, 521 *A.*2d 867 (App.Div.1987) ("Termination of a bank officer for protesting directors' improprieties is not barred by public policy arising from a regulatory scheme which specifically permits the termination and contains effective other means of dealing with those improprieties.").

Nor was the firing of an employee in retaliation for suing the employer to resolve a salary dispute deemed to violate a clear mandate of public policy. *Alexander v. Kay Finlay Jewelers, Inc.*, 208 *N.J.Super.* 503, 506 *A.*2d 379, *certif. denied*, 104 *N.J.* 466, 517 *A.*2d 449 (1986). There the Appellate Division noted the absence of any statute or regulation prohibiting such a

firing. The employer-employee dispute was found to be entirely private. *Id.* at 508, 506 *A.*2d 379.

In *Schwartz v. Leasametric, Inc.*, 224 *N.J.Super.* 21, 30, 539 *A.*2d 744 (1988), the Appellate Division held that firing an employee to avoid paying commissions does not violate a clear mandate of public policy. The court characterized *Pierce* as requiring "retaliation for an employee's refusal to commit an act which would violate a statute or for assertion of a right protected by legislation, or for firings which were 'invidiously discriminatory.'" *Ibid.* (quoting *Citizens State Bank v. Libertelli, supra,* 215 *N.J.Super.* at 195, 521 *A.*2d 867).

### B

Coastal Eagle and *amici* claim that an action will lie only when an employee is fired in retaliation for exercising rights set forth by statute, regulation, or judicial decision. They support their claim by quoting *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505: "The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions." Therefore, they contend, no clear mandate of public policy can derive from a constitution. We disagree. The wrongful-discharge cause of action that we developed in *Pierce* is broader than defendant contends. No reported opinion from this state's courts has specifically rejected either the state or federal constitution as a source of public policy. Coastal Eagle and *amici* seek too constricted an interpretation of *Pierce.* In that case we did not restrict the cause of action to retaliatory actions or to violations of statutory rights; all we require is that the employee "point to a clear expression of public policy." *Id.* at 73, 417 *A.*2d 505. Both logic and ample precedent support a finding of public policy in the language and jurisprudence of the New Jersey Constitution.

New Jersey has found the Constitution to be such a source. *See, e.g., Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358, 404, 161 *A.*2d 69 (1960) ("Public policy at a given time finds

expression in the Constitution, the statutory law and in judicial decisions."). Courts in other jurisdictions have agreed when addressing wrongful-discharge claims. *See, e.g., Radwan v. Beecham Labs.*, 850 *F.*2d 147, 151–52 (3d Cir.1988) (finding a clear mandate of public policy in New Jersey's constitutional right to collective bargaining, *N.J. Const.* art. 1, ¶ 19); *Zamboni v. Stamler*, 847 *F.*2d 73, 83 (3d Cir.) (finding public policy in free-speech and—assembly clauses of United States and New Jersey Constitutions) *cert. denied*, 488 *U.S.* 899, 109 *S.Ct.* 245, 102 *L.Ed.*2d 233 (1988); *Wagenseller v. Scottsdale Memorial Hosp.*, 147 *Ariz.* 370, 710 *P.*2d 1025, 1033 (1985) (general statement including constitution as source of public policy); *Gantt v. Sentry Ins.*, 1 *Cal.*4th 1083, 4 *Cal.Rptr.*2d 874, 881, 824 *P.*2d 680, 687 (1992) (same); *Parnar v. Americana Hotels, Inc.*, 65 *Haw.* 370, 652 *P.*2d 625, 631 (1982) (same); *Palmateer v. International Harvester Co.*, 85 *Ill.*2d 124, 52 *Ill.Dec.* 13, 15, 421 *N.E.*2d 876, 878 (1988) (same) *Boyle v. Vista Eyewear, Inc.*, 700 *S.W.*2d 859, 871 (Mo.Ct.App.1985) (same); *Burk v. K–Mart Corp.*, 770 *P.*2d 24, 28 (Okla.1989) (same). Having declared the *Pierce* doctrine, this Court is not likely to perceive the state's highest source of public policy, namely, its constitution, as irrelevant.

## IV

### A

The Appellate Division stated that "[p]rivate action does not violate constitutional prohibitions against unreasonable searches," 247 *N.J.Super.* at 305, 589 *A.*2d 170, and noted the consistent judicial rejection of attempts to apply constitutional protections to wrongful-discharge claims based on private-sector drug testing. *Id.* at 305–06, 589 *A.*2d 170 (citing *Johnson v. Carpenter Technology Corp.*, 723 *F.Supp.* 180, 185 (D.Conn. 1989); *Greco v. Halliburton Co.*, 674 *F.Supp.* 1447, 1451 (D.Wyo.1987); *Monroe v. Consolidated Freightways, Inc.*, 654

*F.Supp.* 661, 663 (E.D.Mo.1987); *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 *P.*2d 1123, 1130 (Alaska 1989)).

The court's reliance on *Luedtke* was misplaced, however, for two reasons. First, the Alaska Supreme Court held in that case that despite the inapplicability of Alaska's constitutional-privacy provision to private actors, the provision might form the basis for a public policy supporting privacy. *Id.* at 1132–33. Only after balancing the State's interest in safety against individual privacy did the court find for the employer. See *infra* at 97–98. Second, the court in *Luedtke,* although acknowledging that search-and-seizure protection did not extend to conduct by private actors, found that "the reasoning of the federal courts regarding the intrusiveness of urine testing can illuminate [a] court's consideration of the extent to which personal privacy is violated by these tests." 768 *P.*2d at 1133.

Furthermore, there are at least two sources of the privacy right independent of search-and-seizure protection: the common law and article I, paragraph 1 of the New Jersey Constitution.

In *McGovern v. Van Riper,* 137 *N.J.Eq.* 24, 43 *A.*2d 514 (Ch.), *aff'd,* 137 *N.J.Eq.* 548, 45 *A.*2d 842 (E. & A.1945), the court defined the right of privacy as "the right of an individual to be * * * protected from any wrongful intrusion into his private life which would outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." 137 *N.J.Eq.* at 32, 43 *A.*2d 514 (also noting the first postulation of a right of privacy, in Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy,* 4 *Harv.L.Rev.* 193 (1890)). The *McGovern* court did not distinguish public from private violators.

B

█ The common law recognizes various causes of action relating to the right to privacy. One of those is the tort of intrusion on seclusion. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other

for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Restatement (Second) of Torts*, § 652B (1977). To be an actionable tort, an invasion of privacy need not be physical; it can also arise "by the use of the defendant's senses * * * to oversee or overhear the plaintiff's private affairs * * *." Or "[i]t may be by some other form of investigation or examination into his private concerns * * *." *Id.* cmt. b. To recover under this cause of action the plaintiff need not prove publication of any information. *Ibid.* In discussing section 652B, the Appellate Division declared, "The thrust of this aspect of the tort is * * * that a person's private, personal affairs should not be pried into." *Bisbee v. John C. Conover Agency*, 186 *N.J.Super.* 335, 340, 452 *A.*2d 689 (1982).

## C

■ New Jersey's Constitution embraces two separate privacy rights. The Appellate Division considered privacy solely with reference to article I, paragraph 7—the Search and Seizure Clause. The court was correct in its assertion that the Search and Seizure Clause does not protect citizens from unreasonable searches by private parties, *see United States v. Jacobsen*, 466 *U.S.* 109, 113–14, 104 *S.Ct.* 1652, 1656, 80 *L.Ed.*2d 85, 94 (1984); *State v. Pohle*, 166 *N.J.Super.* 504, 508–09, 400 *A.*2d 109 (App.Div.), *certif. denied*, 81 *N.J.* 328, 407 *A.*2d 1202 (1979), but gave short shrift to the notion that privacy could be a source of public policy supporting a *Pierce* cause of action, 247 *N.J.Super.* at 308, 589 *A.*2d 170, and failed to consider the right to privacy that this Court has derived from article I, paragraph 1 of the New Jersey Constitution.

■ That paragraph provides as follows: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." New Jersey recognizes a right to privacy deriving from

that provision in varying contexts. Robert F. Williams, *The New Jersey State Constitution, A Reference Guide* 30–31 (1990). In *McGovern, supra,* the court noted that the right to privacy "ha[s] its origin in natural law," and that "[i]t is one of the 'natural and inalienable [sic] rights' recognized in article I, section 1 of the constitution of this state." 137 *N.J.Eq.* at 33, 43 *A.*2d 514. (The constitution to which the court referred was the 1844 Constitution, the predecessor to the 1947 Constitution now in force.)

We have recognized a constitution-based privacy right in many contexts: marriage and familial association, *Greenberg v. Kimmelman,* 99 *N.J.* 552, 572, 494 *A.*2d 294 (1985) (subject to "reasonable" regulation by the State); refusal of medical treatment, *In re Quinlan,* 70 *N.J.* 10, 40, 355 *A.*2d 647 (patient in persistent vegetative state), *cert. denied,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976); consensual adult sexual relations, *State v. Saunders,* 75 *N.J.* 200, 213–14, 381 *A.*2d 333 (1977); disclosure of confidential personal information, *In re Martin,* 90 *N.J.* 295, 318, 324–25, 447 *A.*2d 1290 (1982) (balanced against government's need for information; Court also required promulgation of regulations to prevent public dissemination of information provided by applicants for casino employment); and procreative rights, *Right to Choose v. Byrne,* 91 *N.J.* 287, 303–04, 450 *A.*2d 925 (1982) (elective abortion) (citing *Schroeder v. Perkel,* 87 *N.J.* 53, 66, 432 *A.*2d 834 (1981); *Berman v. Allan,* 80 *N.J.* 421, 432, 404 *A.*2d 8 (1979); *Doe v. Bridgeton Hosp. Ass'n,* 71 *N.J.* 478, 366 *A.*2d 641 (1976), *cert. denied,* 433 *U.S.* 914, 97 *S.Ct.* 2987, 53 *L.Ed.*2d 1100 (1977); *Gleitman v. Cosgrove,* 49 *N.J.* 22, 62–63, 227 *A.*2d 689 (1967) (Weintraub, C.J., dissenting in part); *Comras v. Lewin,* 183 *N.J.Super.* 42, 443 *A.*2d 229 (App.Div.1982)); *In re Grady,* 85 *N.J.* 235, 247–50, 426 *A.*2d 467 (1981) (voluntary sterilization).

D

Because the question was neither briefed nor argued, we do not decide today whether random urine testing violates either

common-law or constitutional privacy rights. However, we need not do so to determine whether those rights give rise to a clear mandate of public policy that allows a fired employee to state a *Pierce* cause of action. Indeed, at least one other court has found such a mandate even while ruling out a direct privacy right that precludes random testing.

In *Luedtke, supra*, the Alaska Supreme Court held that the Alaska Constitution's privacy guarantee applied only to public actors, but that public policy entitled private employees to withhold private information from their employers. 768 *P.*2d at 1131–33. Although the constitutional right to privacy did not protect the private employees, it could "be viewed by this court as evidence of a public policy supporting privacy." *Id.* at 1132–33. Like the present case, *Luedtke* also confronted the problem of employee drug-testing in the oil industry.

The plaintiffs in *Luedtke* were brothers who worked on a rig for an oil-drilling company. One brother, Paul, failed a urine test given during the course of a company-mandated physical examination. The company instituted a testing policy two weeks after Paul's initial examination and suspended him, telling him that he might return to work only after passing two subsequent tests, one month apart. *Id.* at 1125–26. Because he refused to take the first of the scheduled tests, the company terminated him. The second brother, Clarence, refused to submit to any tests as " 'a matter of principle,' " *id.* at 1126, and he too was fired.

The court found that infringements by private employers on an employee's right to withhold private information violate a public policy, *id.* at 1131–32, and devised a balancing test, weighing that public policy against a competing public policy favoring public safety, *id.* at 1133–34. The court noted that "society often tolerates intrusions into an individual's privacy under circumstances similar to those present in urinalysis," *id.* at 1135 (citing *National Treasury Employees Union v. Von Raab*, 808 *F.*2d 1057, 1061 (5th Cir.1987) (P. Higginbotham, J.,

concurring), *aff'd in part, vacated in part,* 489 *U.S.* 656, 109 *S.Ct.* 1384, 103 *L.Ed.*2d 685 (1989)), and concluded that "it is the reason the urinalysis is conducted, and not the conduct of the test, that deserves analysis," *ibid.* Although recognizing "a sphere of activity in every person's life that is closed to scrutiny by others," *ibid.,* the court stated that "[t]he boundaries of that sphere are determined by balancing a person's right to privacy against other public policies, such as 'the health, safety, rights and privileges of others.'" *Id.* at 1135–36 (quoting *Ravin v. State,* 537 *P.*2d 494, 504 (Alaska 1975) (under Alaska Constitution, State may not prohibit in-home use of marijuana)).

The court considered the dangerousness of the plaintiffs' work, noting the trial court's finding that drug-free performance was important in protecting the safety of co-workers and of the oil field. *Id.* at 1136. It concluded that "[w]here the public policy supporting [an employee's] privacy in off-duty activities conflicts with the public policy supporting the protection of the health and safety of other workers, and even the [employee], the health and safety concerns are paramount." *Ibid.* Therefore, random testing of private employees in safety-sensitive jobs is permissible. However, in the interest of protecting employees' privacy rights, the court limited the employer's power to test: the testing must be carried out "reasonably contemporaneous[ly]" with the employee's work time (Paul's initial test had been during a month-long vacation), and employers must give employees notice of the adoption of a drug-testing program. *Id.* at 1136–37. Because the brothers had notice of the tests that they refused to take, the court upheld the firings. *Id.* at 1137.

Thus, persuasive precedent supports finding a clear mandate of public policy in privacy rights from several sources. Although one of those sources is the State Constitution, we emphasize that we are *not* finding in this opinion a constitutional right to privacy that governs the conduct of private actors. Rather, we find only that existing constitutional privacy protec-

tions may form the basis for a clear mandate of public policy supporting a wrongful-discharge claim.

## V

### A

■ Hennessey alleges two different types of privacy violation. First, he asserts that forced extraction of urine in the presence of an observer is extremely intrusive. Second, he claims that the testing process potentially gives the employer access to much irrelevant private information about the employee—the presence of epilepsy, for example. We agree with plaintiff's contention that mandatory random urine testing by private employers can be an invasion of privacy sufficient to breach public policy, deriving from both the common law and New Jersey's Constitution. *See Fraternal Order of Police v. City of Newark, supra*, 216 *N.J.Super.* at 474, 524 *A.*2d 430; *see also* Alan B. Handler, *Individual Worth*, 17 *Hofstra L.Rev.* 493, 515 (1989) ("Dignity invokes the values inherent in the integrity of one's own personality and the right to be free from intrusion.").

However, more is needed than simply the breach of public policy affecting a single person's rights to constitute the breach of a "clear mandate" of public policy that *Pierce* requires. Determining public policy is a matter of weighing competing interests. *See, e.g., Wright v. Board of Educ.*, 99 *N.J.* 112, 117, 491 *A.*2d 644 (1985) (although public employees have right to collective bargaining, scope of negotiations is determined by balancing competing interests of government and employees, in order to limit impairment of governmental policy determinations); *Coleman v. Newark Morning Ledger Co.*, 29 *N.J.* 357, 376, 149 *A.*2d 193 (1959) (privilege in defamation cases is determined by accommodating competing interests: individual's right to protect reputation as opposed to "collective security" and public interest in officials' freedom to make disclosures); *State v. Kociolek*, 23 *N.J.* 400, 414, 129 *A.*2d 417 (1957) (attor-

ney-client privilege is "an accommodation of competing public interests").

■ A "clear mandate of public policy" must be one that on balance is beneficial to the public. In *Pierce, supra,* we examined the public interest in continued drug research and decided that the Hippocratic oath did not "contain a clear mandate of public policy that prevented Dr. Pierce from continuing her research on loperamide." 84 *N.J.* at 76, 417 *A.*2d 505. Because "[t]he public has an interest in the development of drugs, subject to the approval of a responsible management and the FDA, to protect and promote the health of mankind," *ibid.,* we concluded that Dr. Pierce had not stated a cause of action for wrongful discharge. In short, we balanced her right to act according to her conscience against the need to protect the public.

■ Similarly, although employees have a right to be protected from intrusions of privacy, we must also consider the competing public interest in safety. To constitute a "clear mandate of public policy" supporting a wrongful-discharge cause of action, the employee's individual right (here, privacy) must outweigh the competing public interest (here, public safety). Other jurisdictions that have recognized such a cause of action have used a similar approach, seeking to "accommodate the competing interests of society, the employee and the employer." *Burk v. K–Mart Corp., supra,* 770 *P.*2d at 28 (citing *Palmateer v. International Harvester Co., supra,* 52 *Ill.Dec.* at 15, 421 *N.E.*2d at 878).

Courts considering wrongful-discharge claims in the context of drug testing have also used similar balancing tests. They have held that termination of a private employee who failed a drug test may support a wrongful-discharge claim, only to temper that holding by stating that if the plaintiff's job is safety-sensitive, the competing policy of safety will defeat an individual interest in privacy. In *Luedtke, supra,* the court justified its use of the balancing test by recognizing the ex-

treme hazards associated with work on an oil rig. 768 *P*.2d at 1136 & n. 12. In *Twigg v. Hercules Corp.*, 185 *W.Va.* 155, 406 *S.E.*2d 52 (1990), the court found that mandatory random drug testing by a private employer is a violation of the right to privacy, and as such is contrary to public policy. *Id.* at 55. However, the court also made two exceptions to that rule, one being "where an employee's job responsibility involves public safety or the safety of others." *Ibid.* The other exception allows testing when the employer has a "reasonable good faith objective suspicion of an employee's drug usage." *Ibid.*

And in *Luck v. Southern Pacific Transportation Co.*, 218 *Cal.App.*3d 1, 267 *Cal.Rptr.* 618, *cert. denied,* — *U.S.* —, 111 *S.Ct.* 344, 112 *L.Ed.*2d 309 (1990), a California appeals court noted the California Supreme Court's prior holding "that the taking of a urine sample invokes 'privacy and dignitary interests protected by the due process and search and seizure clauses.'" *Id.* at 626 (quoting *People v. Melton*, 44 *Cal.*3d 713, 244 *Cal.Rptr.* 867, 880 n. 7, 750 *P.*2d 741, 754 n. 7, *cert. denied,* 488 *U.S.* 934, 109 *S.Ct.* 329, 102 *L.Ed.*2d 346 (1988)). The court in *Luck* concluded that urinalysis "intrudes upon reasonable expectations of privacy." *Ibid.* (citing *Wilkinson v. Times Mirror Corp.*, 215 *Cal.App.*3d 1034, 264 *Cal.Rptr.* 194, 203–04 (1989)). As did the courts in *Luedtke, supra,* and *Twigg, supra,* however, the court in *Luck* moderated its finding by noting that intrusions violating the right to privacy are permissible if "justified by a compelling interest," *id.* at 629, with the employer bearing the burden of proof.

The employer in *Luck* had argued that its need to promote safety presented such a compelling interest. Implicitly agreeing, the court went on to determine that the employer had not shown that the plaintiff's job was safety-related and that therefore discharging her for refusing to submit to random urine testing violated public policy. *Id.* at 630–32.

■ We agree with the Alaska Supreme Court's conclusion that safety outweighs a right to privacy in off-duty activities. See *Luedtke, supra,* 768 *P.*2d at 1136 ("the health and safety concerns are paramount"); *accord Luck, supra,* 267 *Cal.Rptr.* at 630–32; *Twigg, supra,* 406 *S.E.*2d at 55. The public has a compelling interest in safety. *State v. Fields,* 77 *N.J.* 282, 303, 390 *A.*2d 574 (1978) (noting "the State's compelling interest in maintaining the safety and security of its citizens"). Thus, whether firing an employee for failing (or refusing to take) a random urine test violates a clear mandate of public policy depends on the nature of the employee's job. The public's interest in ensuring that workers in safety-sensitive positions are drug-free outweighs any individual right to privacy, and one way to vindicate that interest is to permit employers to test those workers and to discharge them for failing those tests. Because that question is so closely related to the type of job for which testing is conducted, it may be better resolved in a collective-bargaining agreement or by legislative action. See *infra* at 107–08. However, absent such a development, judicial resolution is appropriate.

## B

In ascertaining whether an employee's individual rights constitute a "clear mandate of public policy," we must balance the public interest against the employee's right. If the employee's duties are so fraught with hazard that his or her attempts to perform them while in a state of drug impairment would pose a threat to co-workers, to the workplace, or to the public at large, then the employer must prevail.

Several administrators from Coastal Eagle testified about the dangerous nature of Hennessey's job. Michael Hoey (manager of employee relations) noted in an affidavit that Hennessey received little direct supervision; indeed, the refinery's round-the-clock schedule requires that employees working nights and weekends "carry additional responsibilities in managing emer-

gencies until the appropriate support is called in." And James Myers, the manager of the Movement and Storage Division, attested in an affidavit that the potential consequences of error

> are staggering and include fires and/or explosions resulting in human death or severe bodily injury; environmental damage to water, land and air; property damage and human injury to the surrounding community; and extensive multi-million dollar property damage within the refinery. For example, an error by a lead pumper, such as Mr. Hennessey, can cause an overflow of product in the Tank Farm where products are moved and stored and can result in a vapor cloud which, if ignited by any source, will result in a major fire and/or explosion impacting the entire refinery and surrounding community.

Hennessey himself acknowledged the potential for danger. When asked in a deposition why care must be taken not to permit the oil tanks to overflow, he replied, "You don't want the oil on the ground for one thing because it's wasted product. And if it's volatile enough, you have an explosion." And when asked whether it was "important * * * that the pumpers and gaugers remain alert while they were on duty," he answered, "Certainly."

C

Although Hennessey does not dispute the potential hazards associated with his job, he claims that Coastal Eagle must use the least-intrusive means of testing for impairment. He contends first that urine testing detects only the presence of drugs in the system, not the degree of impairment. Second, he argues that besides its ineffectiveness, urine testing violates his privacy because less-intrusive means of detecting impairment are available. He maintains that either observation or performance testing would resolve both problems. Those methods would detect impairment resulting not only from drug or alcohol abuse but from other sources as well—for instance, various types of stress. Those means would also be less intrusive than urine testing. Coastal Eagle contends that those means are not feasible because many of the workers in the plant are unsupervised.

*Amicus curiae* Department of the Public Advocate contends that *Fraternal Order of Police, supra,* 216 *N.J.Super.* 461, 524 *A.*2d 430, supports a requirement that private employers use only the least-intrusive means of testing. In deciding that random testing violated police officers' search-and-seizure rights under New Jersey's Constitution, the Appellate Division required that the defendants prove the " 'overall reasonableness and validity of the search.' " *Id.* at 470, 524 *A.*2d 430 (quoting *State v. Valencia,* 93 *N.J.* 126, 133, 459 *A.*2d 1149 (1983)).

The Public Advocate claims that in *Fraternal Order of Police,* the court's consideration of "[t]he availability and practicality of alternative means of investigating the asserted evil" as one factor in determining reasonableness, *ibid.,* indicates that employers must use the least-intrusive means of testing. However, "availability and practicality" is a highly fact-specific standard. For instance, in requiring reasonable individualized suspicion for drug testing, the court noted that "[i]n weighing the public need against the private intrusion, the courts are persuaded by the absence of a factual showing that drug use is widespread among the affected employees or that it presents an identifiable risk to the public," *id.* at 472–73, 524 *A.*2d 430, and concluded that a reasonable-suspicion requirement balanced the employee's privacy interest with the employer's need to "monitor and control" drug use among its employees, *id.* at 473, 524 *A.*2d 430. Here, the record indicates both a showing of drug use among employees (a nineteen-percent positive result in the "pre-employment" physicals and the evidence of on-site marijuana use) and an identifiable risk to the public (the danger of an explosion or environmental accident as the result of a mistake by a lead pumper).

The court in *Fraternal Order of Police* cited three cases in which federal courts upheld random drug testing of public employees. *Id.* at 473, 524 *A.*2d 430 (citing *McDonell v. Hunter,* 809 *F.*2d 1302, 1308 (8th Cir.1987) (corrections officers having regular day-to-day contact with inmates of medium- or

maximum-security prisons); *Rushton v. Nebraska Pub. Power Dist.*, 653 *F.Supp.* 1510 (D.Neb.1987) (certain employees of nuclear power plants), *aff'd*, 844 *F.*2d 562 (8th Cir.1988); *Mack v. United States*, 653 *F.Supp.* 70 (S.D.N.Y.1986) (FBI agents), *aff'd*, 814 *F.*2d 120 (2d Cir.1987)). It distinguished those cases by noting that they all involved employees whose occupations presented a "public need for such testing." *Id.* at 473–74, 524 *A.*2d 430. The potential for danger in an oil refinery is certainly analogous to, if not quite as intense as, that in a nuclear power plant.

In the time since *Fraternal Order of Police* was decided, federal courts have allowed random urine testing of some employees in the public sector or in heavily-regulated industries. *See, e.g., National Treasury Employees Union v. Von Raab, supra,* 489 *U.S.* 656, 109 *S.Ct.* 1384, 103 *L.Ed.*2d 685 (customs employees seeking promotion or transfer to specified positions); *Skinner v. Railway Labor Executives' Ass'n,* 489 *U.S.* 602, 109 *S.Ct.* 1402, 103 *L.Ed.*2d 639 (1989) (railroad employees involved in train accidents or who violate safety rules); *National Fed'n of Fed. Employees v. Cheney,* 884 *F.*2d 603 (D.C.Cir.1989) (civilian employees of U.S. Army working in aviation, police-guard, or substance-abuse-treatment positions), *cert. denied,* 493 *U.S.* 1056, 110 *S.Ct.* 864, 107 *L.Ed.*2d 948 (1990); *Harmon v. Thornburgh,* 878 *F.*2d 484 (D.C.Cir.1989) (Justice Department employees who hold top-secret clearances), *cert. denied,* 493 *U.S.* 1056, 110 *S.Ct.* 865, 107 *L.Ed.*2d 949 (1990).

The court in *Fraternal Order of Police, supra,* relied on guidelines that the Attorney General had promulgated. Those guidelines are instructive. They advise that random drug testing of police officers would be inappropriate not only because there was no conclusive evidence of widespread drug use, but because

objective indications of drug use will adequately identify those law enforcement officers who use illegal drugs. Specific objective factors such as absenteeism, deterioration of work habits, chronic lateness, and confidential information as to

illegal drug use constitute reasonable objective bases or reasonable suspicion to suspect that urinalysis will produce evidence of illegal drug use. (footnote omitted).

[216 *N.J.Super.* at 476, 524 *A.*2d 430 (quoting Law Enforcement Drug Screening Guidelines (1986)).]

In this case, however, such indications are not available because Hennessey, and other workers in safety-sensitive positions at the refinery, often function independently. That lack of supervision renders observation to detect impairment impractical. "Detecting drug impairment on the part of employees can be a difficult task, especially where * * * it is not feasible to subject employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Von Raab, supra,* 489 *U.S.* at 674, 109 *S.Ct.* at 1395, 103 *L.Ed.*2d at 707.

Plaintiff also contends that urine testing is not a valid method of preventing drug-related accidents because urine testing does not detect actual impairment. In *Cheney, supra,* the court of appeals dismissed a similar argument by noting that in *Von Raab* the Supreme Court had simply "referred only to the [Customs] Service's broad responsibility to 'ensur[e] against the creation of this dangerous risk,' a risk that urinalysis testing reasonably, albeit imperfectly, helped detect and prevent." 884 *F.*2d at 609 (quoting *Von Raab, supra,* 489 *U.S.* at 671, 109 *S.Ct.* at 1393, 103 *L.Ed.*2d at 705).

We agree that the combination of the impracticality of less-intrusive means of detecting drug use and the urgent need to ensure public safety renders urine testing a permissible method of preventing drug use among employees in safety-sensitive jobs. However, we emphasize the importance of protecting employee privacy, and to that end we strongly recommend that employers formulate and implement measures designed to minimize the intrusiveness of the testing process. Those measures should include a testing procedure that allows as much privacy and dignity as possible; and notice, close in time to the beginning of a testing program but sufficient to

provide adequate advance warning, that announces the program, details the method for selecting employees to be tested, warns employees of the lingering effect of certain drugs in the system, explains how the sample will be analyzed, and notifies employees of the consequences of testing positive or refusing to take the test. Furthermore, employers may conduct only those tests necessary to determine the presence of drugs in the urine, and are under an obligation not to disclose information obtained as a result of testing.

## VI

█ Because the safety-sensitive nature of Hennessey's employment raises the potential for enormous public injury, the public policy supporting safety outweighs any public policy supporting individual privacy rights. Therefore, we uphold Coastal Eagle's decision to discharge Hennessey. We note, however, that the complex issues of drug-testing in the workplace are better addressed in the contexts of legislative action or labor-relations agreements. The Legislature has defined the limits of other forms of testing. See, e.g., *N.J.S.A.* 2C:40A–1 (lie-detector tests); *N.J.S.A.* 18A:16–2 to –3 (psychiatric testing for employees of boards of education); *N.J.S.A.* 40A:14–146.10 (psychological testing of special law-enforcement officers). Moreover, that body has explored workplace drug testing, see Rorie Sherman, *Workplace Drug Testing Raises Legal Questions, New Jersey Law Journal,* May 21, 1987, at 34 (noting bill to regulate drug testing that was then before State Senate Labor, Industry and Professions Committee), and can more fully define the contours of the competing rights of employers and employees. Many states have enacted legislation to control the use of drug testing in a variety of contexts. *See, e.g., Ariz.Rev.Stat.Ann.* § 15–513 (1991); *Conn.Gen.Stat.Ann.* §§ 31–51t to –51aa (West Supp.1992); *Fla.Stat.Ann.* § 112.0455 (West Supp.1992); *Ga.Code Ann.* § 21–2–140 (Michie Supp. 1990) (candidates for public office); §§ 45–20–90 to –93 (Michie 1990) (state employees in high-risk jobs); §§ 45–20–110 to –112

(Michie 1990) (applicants for state employment); *Haw.Rev.Stat.* §§ 329B–1 to –8 (Supp.1991); *Iowa Code Ann.* § 730.5 (West Supp.1992); *Kan.Stat.Ann.* §§ 75–4362 to –4363 (Supp.1991); *La.Rev.Stat.Ann.* §§ 49:1001 to :1002, :1005 to :1008, :1011 to :1012, :1015 (West Supp.1992); *Me.Rev.Stat.Ann.* tit. 26, §§ 681–690 (West Supp.1991); *Md. Health–Gen. Code Ann.* § 17–214.1 (1990); *Minn.Stat.Ann.* §§ 181.950 to .957 (West Supp.1992); *Miss.Code Ann.* §§ 71–7–1 to –33 (Supp.1991); *Mont.Code Ann.* § 39–2–304 (1991); *Neb.Rev.Stat.* §§ 48–1901 to –1910 (1988); *N.C.Gen.Stat.* §§ 95–230 to –234 (Supp.1991); *R.I.Gen.Laws* § 28–6.5–1 (Supp.1991); *S.C.Code Ann.* § 55–1–100 (Law.Co-op.1992); *S.Dak. Codified Laws Ann.* §§ 23–3–64 to –69 (Supp.1991); *Utah Code Ann.* §§ 34–38–1 to –15 (1988); *Vt.Stat.Ann.* tit. 21, §§ 511–520 (1987).

The judgment of the Appellate Division is affirmed. No costs.

POLLOCK, J., concurring.

I agree with the majority that an employer does not violate a clear mandate of public policy by firing a safety-sensitive employee who fails a random drug test. I also agree that both article 1, paragraph 1 of the New Jersey Constitution, *ante* at 92–93, and the common-law right of privacy, *ante* at 98–99, may be sources of such a mandate under *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 417 *A.*2d 505 (1980). Finally, I agree that regulation of drug testing in the workplace is better achieved by legislation or labor-management agreements. *Ante* at 107.

I write separately because I believe that the common law provides the only clear mandate of public policy to support a claim for wrongful discharge based on an invasion of privacy. Although the majority recognizes that the common-law right of privacy supports such a mandate, *ante* at 94–95, it also relies on the right of privacy in article 1, paragraph 1 as an alternative source. The disagreement, although seemingly esoteric, re-

veals a basic difference in our respective perceptions of the role of the judiciary.

–I–

Established jurisprudential principles counsel that a court should not decide a case on a constitutional basis when a non-constitutional basis is available. "[T]here is the sound, oft-expressed principle that constitutional questions should not be reached and resolved unless absolutely imperative in the disposition of the litigation. While the adjudicative process admits of few unyielding rules, this maxim comes as close as any to being an absolute." *State v. Saunders*, 75 *N.J.* 200, 229, 381 *A.*2d 333 (1977) (Clifford, J., dissenting). *Accord Donadio v. Cunningham*, 58 *N.J.* 309, 325–26, 277 *A.*2d 375 (1971); *Ahto v. Weaver*, 39 *N.J.* 418, 428, 189 *A.*2d 27 (1963); *State v. Salerno*, 27 *N.J.* 289, 296, 142 *A.*2d 636 (1958); *Grant v. Wright*, 222 *N.J.Super.* 191, 197–98, 536 *A.*2d 319 (App.Div.), *certif. denied*, 111 *N.J.* 562, 546 *A.*2d 493 (1988); *State v. Corson*, 67 *N.J.L.* 178, 187, 50 *A.* 780 (Sup.Ct.1901).

The majority tries to avoid a constitutional basis for its decision by stating that "we do not decide today whether random urine testing violates either common-law or constitutional privacy rights." *Ante* at 96–97. It then proceeds, however, to recognize a constitutional right. To say as the majority says that article 1, paragraph 1 provides a clear mandate of public policy, *ibid.*, while simultaneously saying that "we are *not* finding in this opinion a constitutional right to privacy that governs the conduct of private actors," *ante* at 98, is to draw too fine a distinction. Either the New Jersey Constitution supports a right of privacy that protects a private employee from random drug testing or it does not. If, as the majority finds, the State Constitution recognizes such a right, then the right should be enforceable. I would avoid the dilemma by not reaching the constitutional issue.

Instead of resorting to a quasi-constitutional right, the Court need look only to the common law for a clear mandate of public policy. We have recognized that the common law is better suited than constitutional law to transport notions of fairness and justice into judicial decisions. For example, we have written that "[a]lthough constitutional considerations have dominated defamation law in recent years, the common law provides an alternative, and potentially more stable, framework for analyzing statements about matters of public interest." *Dairy Stores, Inc. v. Sentinel Pub. Co.*, 104 *N.J.* 125, 139, 516 *A.*2d 220 (1986).

Historically, the right of privacy was conceived not as a constitutional, but as a common-law, concept. The right traces its origins in civil law to a law review article written over a century ago by Professors Samuel D. Warren and Louis D. Brandeis, which discusses privacy only as a common-law concept. *The Right of Privacy*, 4 *Harv.L.Rev.* 193 (1890). As with defamation law, the common-law right of privacy has been first adopted, then absorbed by a parallel constitutional right. Courts have transformed the right, which was initially conceived as a means for courts to resolve differences between private parties, into a vehicle to protect individuals from state action.

Not finding any specific textual reference to support the right, the United States Supreme Court, in the landmark case of *Griswold v. Connecticut*, 381 *U.S.* 479, 483, 85 *S.Ct.* 1678, 1681, 14 *L.Ed.*2d 510, 514 (1965), placed it in "a penumbra where privacy is protected from governmental intrusion." Justice Black dissented, stating:

Observing that "the right of privacy * * * presses for recognition here," today this Court, which I did not understand to have power to sit as a court of common law, now appears to be exalting a phrase which Warren and Brandeis used in discussing grounds for tort relief, to the level of a constitutional rule which prevents state legislatures from passing any law deemed by this Court to interfere with "privacy."

[*Id.* at 510 n. 1, 85 *S.Ct.* at 1695 n. 1, 14 *L.Ed.*2d at 530–31 n. 1.]

Federal courts create common law only in exceptional circumstances not applicable here. *Texas Indus., Inc. v. Radcliffe Materials, Inc.,* 451 *U.S.* 630, 641, 101 *S.Ct.* 2061, 2067, 68 *L.Ed.*2d 500, 509 (1981) ("absent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases") (footnotes omitted). *Compare Erie R.R. v. Tompkins,* 304 *U.S.* 64, 78, 58 *S.Ct.* 817, 822, 82 *L.Ed.* 1188, 1194 (1938) ("There is no federal general common law.") *with Hinderlider v. La Plata Co.,* 304 *U.S.* 92, 110, 58 *S.Ct.* 803, 822, 82 *L.Ed.* 1202, 1212 (1938) ("whether the water of an interstate stream must be apportioned between the two States is a question of 'federal common law' "). By comparison, state courts for centuries have resorted to the common law to resolve disputes between private parties. As courts of limited jurisdiction, *U.S. Const.* art. III, § 2, federal courts understandably may be confined to constitutional decisionmaking. Less understandable is why that tendency of federal courts should persuade this court to ignore its common-law birthright.

–II–

The public policy supporting the right of privacy differs from the public policies recognized in other wrongful-discharge cases. A major difference is that neither the New Jersey Constitution nor any legislation expressly recognizes the right. The wrongfulness of a discharge that infringes on a privacy interest, therefore, is not as apparent as a discharge that violates a more explicit right. More manifest, for example, is the wrongfulness of a discharge that violates a statutory mandate, such as a discharge in retaliation for filing a claim under the workers' compensation law, *Lally v. Copygraphics,* 85 *N.J.* 668, 428 *A.*2d 1317 (1981), or for investigating a claim under

laws preventing employment discrimination, *Velantzas v. Colgate–Palmolive Co.*, 109 *N.J.* 189, 536 *A.*2d 237 (1988).

Compounding the problem is the limited role of courts in declaring public policy on so sensitive a subject. As the majority recognizes, "the complex issues of drug-testing in the workplace are better addressed in the contexts of legislative action or labor-relations agreement." *Ante* at 107. These considerations counsel a judicial response that accords latitude to employers, employees, and the Legislature in addressing the problem. A response based on the common-law right of privacy provides greater latitude than one that is constitutionally based. Such a response, moreover, naturally flows from state courts as the custodians of the common law.

From the perspective of the parties, the issue is the extent to which an employer may inquire about an employee's conduct when the inquiry involves aspects of the employee's life that would otherwise remain private. Some aspects of an employee's life should be protected from the unwelcome inquiry of an employer; others are more amenable to review.

Traditional constitutional analysis of the right of privacy identifies two privacy interests.

> One is concerned with autonomy, "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 *U.S.* 589, 599, 97 *S.Ct.* 869, 876, 51 *L.Ed.*2d 64, 73 (1977). The other interest is one of confidentiality, "the individual interest in avoiding disclosure of personal matters." *Id.* at 598–99, 97 *S.Ct.* at 876, 51 *L.Ed.*2d at 73. The protection of autonomy is limited to a few "fundamental" areas, including marriage, procreation, contraception, family relationships, child rearing, and education.
>
> [*Snyder v. Melkhjian*, 125 *N.J.* 328, 342, 593 *A.*2d 318 (Pollock, J., concurring) (citations omitted).]

The privacy right of autonomy, although not expressly mentioned, is fairly implicit in article 1, paragraph 1 of the New Jersey Constitution. C. Willard Heckel, *The Bill of Rights*, in II *Constitutional Convention of 1947* 1336, 1339 (1951). Accordingly, we have found:

> The right of privacy has been found to extend to a variety of areas, including sexual conduct between consenting adults; the right to sterilization; and even

the right to terminate life itself. These cases establish that "under some circumstances, an individual's personal right to control her own body and life overrides the State's general interest in preserving life."

[*Right to Choose v. Byrne*, 91 *N.J.* 287, 303, 450 *A.*2d 925 (1982) (citations omitted).]

*Cf. State v. Lair*, 62 *N.J.* 388, 398, 301 *A.*2d 748 (1973) (Weintraub, C.J. concurring) (expressing doubts about legitimacy of statute criminalizing consensual homosexual sex); *Gleitman v. Cosgrove*, 49 *N.J.* 22, 59, 227 *A.*2d 689 (1967) (Weintraub, C.J., concurring) (considering legitimacy of statute criminalizing abortion in light of woman's right to bodily integrity); *Smith v. Board of Examiners*, 85 *N.J.L.* 46, 53–55, 88 *A.* 963 (Sup.Ct. 1913) (setting aside order for sterilization of epileptic on federal equal protection grounds).

The evolution of "the right to die" demonstrates the Court's appreciation that it is more judicious to predicate the right of privacy on a common-law, rather than a constitutional, basis. In the first such case, *In re Quinlan*, 70 *N.J.* 10, 355 *A.*2d 647, *cert. denied sub nom. Garger v. New Jersey*, 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976), the Court predicated the right to remove the patient's respirator on the rights of privacy under the New Jersey and federal constitutions. *Id.* at 38–40, 355 *A.*2d 647. Later we shifted the basis of our decisions to the common-law right of self-determination or autonomy. *In re Conroy*, 98 *N.J.* 321, 346–48, 486 *A.*2d 1209 (1985). Even more recently, we have recognized that the right is based "primarily" on the common law. *In re Farrell*, 108 *N.J.* 335, 348, 529 *A.*2d 404 (1987). That evolution reflects the traditional judicial preference for basing decisions on the common law. It also reflects this Court's awareness that a common-law basis smooths the path for legislative action. Conversely, when a court bases its decisions on the constitutional right of privacy, it places an undefined area of decision-making beyond legislative control.

Evaluation of the issue of random drug testing inevitably compels balancing the interests of the employee and the employer. From an employer's perspective, an employee's use of illegal drugs presents multiple problems. For example, the use

of illegal drugs can affect an employee's performance, see Craig Zwerling, et al., *The Efficacy of Preemployment Drug Screening for Marijuana and Cocaine in Predicting Employment Outcome*, 264 *JAMA* 2639 (1990) (positive pre-employment drug tests for marijuana or cocaine associated with adverse employment outcomes), endanger co-workers, and increase health-care costs.

Random drug testing through urine samples, however, impinges on an employee's privacy interests in two ways. One arises from the process of taking the urine specimen; the other from intruding into areas of the employee's life that would otherwise remain unknown to the employer. *Borse v. Piece Goods Shop*, 963 *F.*2d 611, 622–23 (3d Cir.1992). Appropriate steps can reduce the intrusiveness of the method of collection. *Ante* at 107. For example, at least three federal agencies have determined that the integrity of urine specimens may be maintained without the type of direct observation employed in this case. See 49 *C.F.R.* § 40.25 (Department of Transportation); 46 *C.F.R.* § 16.310 (Coast Guard); 10 *C.F.R.* pt. 26, app. A § 2.4 (Nuclear Regulatory Commission).

Acquiring otherwise-private information about an employee is more troublesome. Disclosure of such information, however, implicates only the employee's interest in confidentiality, *see Johnson v. Carpenter Technology Corp.*, 723 *F.Supp.* 180, 186 (D.Conn.1989), an interest that has not fared as well as autonomy, *Snyder, supra,* 125 *N.J.* at 342, 593 *A.*2d 318 (Pollock, J., concurring). As the majority acknowledges, this interest, when invoked by an employee in a safety-sensitive position, is weak. *Ante* at 102. Remaining open is the question of the extent to which the confidentiality of that interest strengthens as the employee's responsibilities become less safety-sensitive. A confidentiality interest is not a fundamental right, but one that is assayed "in a balancing test weighing the personal nature of the information and the extent of the disclosure against the need for the information and the safeguards against undue

disclosure." *Snyder, supra,* 125 *N.J.* at 343, 593 *A.*2d 318 (Pollock, J., concurring).

Rather than speculate about the implications of the characteristics of the confidentiality interest in random drug testing, I would avoid the constitutional question altogether. The common law provides an adequate answer. As defined by the *Restatement (Second) of Torts* § 652B (1977), "one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

Application of that test involves a balance of competing interests. As the Third Circuit recently observed, "determining whether an alleged invasion of privacy is substantial and highly offensive to the reasonable person necessitates the use of a balancing test." *Borse, supra,* 963 *F.*2d at 627. With random drug testing by a private employer, the test will implicate both the employee's privacy interests and the need of the employer for the test results.

Consistent with that premise, the majority

> strongly recommend[s] that employers formulate and implement measures designed to minimize the intrusiveness of the testing process. Those measures should include a testing procedure that allows as much privacy and dignity as possible; and notice, close in time to the beginning of a testing program but sufficient to provide adequate advance warning, that announces the program, details the method for selecting employees to be tested, warns employees of the lingering effect of certain drugs in the system, explains how the sample will be analyzed, and notifies employees of the consequences of testing positive or refusing to take the test. Furthermore, employers may conduct only those tests necessary to determine the presence of drugs in the urine, and are under an obligation not to disclose information obtained as a result of testing.
>
> [*Ante* at 106–07.]

Although the majority does not indicate whether its test would apply if the common law were the sole source of public policy, the tort of intrusion would involve the kind of balancing suggested by that test. See *Earp v. City of Detroit,* 16 *Mich.App.* 271, 167 *N.W.*2d 841, 845–46 (1969) (fact-sensitive

balancing between privacy interest of employee and business interest of employer).

Missing from the majority's calculus is the public policy against the illegal use of drugs. The Legislature has found that "the unlawful use, manufacture and distribution of controlled dangerous substances continues to pose a serious and pervasive threat to the health, safety and welfare of the citizens of this State." *N.J.S.A.* 2C:35–1.1(b). Recently, Governor Jim Florio announced the formation of a non-profit corporation, the Governor's Council for a Drug Free Workplace. The Council's purpose is "to rid offices and factories of illegal drugs and develop a uniform drug-testing policy for use by businesses." Robert Schwaenberg, *Drugs in the Workplace: Chamber of Commerce, State Join to Chart Test Policy,* The Star–Ledger, July 11, 1992, at 1. Thus, the public policy of this state is to deter the use of illegal drugs. So clear a mandate should doubtless be included among the interests to be balanced in determining whether random drug testing supports an action for wrongful discharge. The majority has not only ignored this important aspect of public policy, but by postulating a constitutional right of privacy, has complicated the task of the legislative and executive branches in defining the limits of drug testing in the workplace.

Recognition of a common-law privacy right that limits an employer's right to test for drugs does not foreclose all such testing. A plaintiff asserting a cause of action based on the tort of intrusion must clear a high threshold. To maintain the action, the plaintiff must establish that "the intrusion would be highly offensive to a reasonable person." *Restatement, supra,* § 652B. Although we have not yet considered torts of intrusion, the Appellate Division in *Figured v. Paralegal Technical Servs.,* 231 *N.J.Super.* 251, 555 *A.*2d 663 (1989), *certif. dismissed,* 121 *N.J.* 666, 583 *A.*2d 350 (1990), the Law Division in *N.O.C., Inc. v. Schaefer,* 197 *N.J.Super.* 249, 484 *A.*2d 729 (1984), and the United States District Court for the District of New Jersey in *Tellado v. Time–Life Books, Inc.,* 643 *F.Supp.*

904 (1986), have considered them. All three resulted in summary judgments for the defendants.

In *Pierce*, we expressly recognized the common law as a source of public policy that would support an action in tort or contract for wrongful discharge. 85 *N.J.* at 72, 417 *A.2d* 505. To find a source of public policy, the Court need not survey the boundaries of an uncharted constitutional right. It need only stake out an existing tort action. By relying solely on common-law principles, the majority can avoid entanglement with a constitutional issue.

Regard for the common law is essential if state courts are to discharge their responsibilities as partners in the federalist judicial system. In the future, cases that state courts formerly might have resolved on a federal constitutional basis may be resolved on an independent state ground. The common law can provide such a ground. To the extent that state courts resort to the common law, they can avoid a state constitutional question. Thus, the common law is integral to the evolving role of state courts in the federalist system.

In sum, the common-law tort of invasion of privacy provides a more satisfactory source of public policy than does article 1, paragraph 1 of the State Constitution to determine whether random testing by a private employer would give rise to a wrongful-discharge action. I would affirm because plaintiff has failed to identify a clear mandate of public policy prohibiting the discharge of a safety-sensitive employee who fails a urine test for illegal drugs.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—none.