NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5397-10T2

PATRICIA SOLIMAN,

     Plaintiff-Appellant,

v.

THE KUSHNER COMPANIES, INC.
a/k/a KUSHNER COMPANIES;
WESTMINSTER MANAGEMENT,
L.L.C.; CK BERGEN HOLDINGS,
L.L.C. a/k/a CK BERGEN
HOLDINGS; CK BERGEN
ASSOCIATES, L.L.C. a/k/a
CK BERGEN ASSOCIATES;
KUSHNER PROPERTIES, INC.;
WESTMINSTER MANAGEMENT, L.P.;
ROUTE 208 ASSOCIATES, L.L.C.;
PHIL CHAIKLIN; HIGH TECH
INSTALLATIONS; and HIGH TECH
DEPOT, L.L.C.,

     Defendants-Respondents.

_____

MICHELE F. AVRIN,

     Plaintiff-Appellant,

v.

THE KUSHNER COMPANIES, INC.
a/k/a KUSHNER COMPANIES;
WESTMINSTER MANAGEMENT,
L.L.C.; CK BERGEN HOLDINGS,
L.L.C. a/k/a CK BERGEN
HOLDINGS; CK BERGEN
ASSOCIATES, L.L.C. a/k/a
CK BERGEN ASSOCIATES;
KUSHNER PROPERTIES, INC.;

```
┌─────────────────────────────┐
│    APPROVED FOR PUBLICATION  │
│                             │
│       October 17, 2013       │
│                             │
│      APPELLATE DIVISION      │
└─────────────────────────────┘
```

WESTMINSTER MANAGEMENT, L.P.;
ROUTE 208 ASSOCIATES, L.L.C.;
PHIL CHAIKLIN; HIGH TECH
INSTALLATIONS; and HIGH TECH
DEPOT, L.L.C.,

     Defendants-Respondents.

_____

CaC (infant Plaintiff #1) by
her mother MAC (Plaintiff #2)
and MAC (Plaintiff #2)
individually;, AaC (infant
Plaintiff #3) and AyC (infant
Plaintiff #4) by their mother
RLC (Plaintiff #5) and RLC
(Plaintiff #5) individually;
TaK (infant Plaintiff #6) by
her father ToK (Plaintiff #7)
and ToK (Plaintiff #7)
individually; SG (infant
Plaintiff #8) by his mother
AG (Plaintiff #9) and AG
(Plaintiff #9 individually);
DK (infant Plaintiff #10) by
her father JK (Plaintiff #11)
and JK (Plaintiff #11)
individually; DeL (infant
Plaintiff #12) and TL (infant
Plaintiff #13) and DaL
(infant Plaintiff #14) by
their mother DL (Plaintiff
#15) and DL (Plaintiff #15)
individually; JG (infant
Plaintiff #16) by his mother
JJ (Plaintiff #17) and JJ
(Plaintiff #17) individually);
JL (infant Plaintiff #18) and
TL (infant Plaintiff #19) by
their mother GCL (Plaintiff
#20) and GCL (Plaintiff #20)
individually; ST (infant
Plaintiff #21) and AT (infant
Plaintiff #22) by their mother
LT (Plaintiff #23) and LT

(Plaintiff #23) individually; AY (infant Plaintiff #24), and LY(infant Plaintiff #25) by their mother WFY (Plaintiff #26) and WFY (Plaintiff #26) individually; KrZ (infant Plaintiff #27) by her mother KZ (Plaintiff #28) and KZ (Plaintiff #28) individually; BF (infant Plaintiff #29) and AF (infant Plaintiff #30) by their parents RF (Plaintiff #31) and MF (Plaintiff #32) and RF (plaintiff #31) and MF (Plaintiff #32) each individually; AN (infant Plaintiff #33) and RN (infant Plaintiff #34) by IN (Plaintiff #35 and IN (Plaintiff #35) individually; JJa (infant Plaintiff #36) by her parents JaJ (Plaintiff #37) and MC (Plaintiff #38) and JaJ (Plaintiff #37) and MC (Plaintiff #38) individually; CB (Plaintiff #39); YC (Plaintiff #40); GE (Plaintiff #41), Edi (Plaintiff #42); AD (Plaintiff #43);, EDr (Plaintiff #44); ADr (Plaintiff #45); GF (Plaintiff #46); SF (Plaintiff #47); CL (Plaintiff #48); AL (Plaintiff #49); MMa (Plaintiff #50); KBM (Plaintiff #51); MMo (Plaintiff #52); KN (Plaintiff #53); MP (Plaintiff #54); IR (Plaintiff #55); KS (Plaintiff #56); CS (Plaintiff #57); BS (Plaintiff #58); LW (Plaintiff #60); and EF

3

(Plaintiff #60);

     Plaintiffs-Appellants,

v.

THE KUSHNER COMPANIES, INC.
a/k/a KUSHNER COMPANIES;
WESTMINSTER MANAGEMENT,
L.L.C.; CK BERGEN HOLDINGS,
L.L.C. a/k/a CK BERGEN
HOLDINGS; CK BERGEN
ASSOCIATES, L.L.C. a/k/a
CK BERGEN ASSOCIATES;
KUSHNER PROPERTIES, INC.;
WESTMINSTER MANAGEMENT, L.P.;
ROUTE 208 ASSOCIATES, L.L.C.;
PHIL CHAIKLIN; HIGH TECH
INSTALLATIONS; and HIGH TECH
DEPOT, L.L.C.,

     Defendants-Respondents.

_____

RICKY DIPILLA, MARY ELLEN
PHELAN, PERRY DEATON, KENNETH
THIMMEL, JONATHAN SCOTT
STEPHENS, PHYLLIS RUBIN,
VIVIANA A. WISSE, MARY
PETRUCELLO, MIKE O'SULLIVAN,
LAURA PHELAN, EDWARD ROBINSON
and WILLIAM NEWMAN,

     Plaintiffs,

v.

ROUTE 208 ASSOCIATES, LLC,
THE KUSHNER COMPANIES,
WESTMINSTER MANAGEMENT, LLC,
CK BERGEN HOLDINGS, LLC,
KUSHNER PROPERTIES, INC.,
WESTMINSTER MANAGEMENT, L.P.,

     Defendants.

_____

Argued May 16, 2012 - Decided October 17, 2013

Before Judges Fuentes, Graves, and Harris.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-2581-08.

Gerald H. Baker argued the cause for appellants (Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, P.C., attorneys; Lawrence M. Simon and Mark J. Cintron, on the brief).

Derek A. Ondis argued the cause for respondents High Tech Installations, High Tech Depot, L.L.C., and Phil Chaiklin (Romando, Zirulnik, Sherlock & DeMille, attorneys; Mr. Ondis, on the brief).

Stuart J. Polkowitz argued the cause for respondents The Kushner Companies, Inc., Westminster Management, L.L.C., CK Bergen Holdings, L.L.C., CK Bergen Associates, L.L.C., Kushner Properties, Inc, Westminster Management, L.P., and Route 208 Associates, L.L.C. (Mautone & Horan, P.A., and Brach Eichler L.L.C., attorneys; James J. Horan and Mr. Polkowitz, of counsel and on the briefs).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

These are four consolidated law suits brought by employees of tenants and members of their families, including minors, against the landlord and managers of this commercial office building, as well as a number of other companies responsible for installing and maintaining video monitoring and recording

equipment intentionally concealed inside smoke detectors in four public bathrooms, two male and two female.[1]

Defendants claimed the cameras were positioned to monitor or focus only on the "common area" of the bathrooms, where the washbasins are located. Stated differently, defendants claim the cameras were not placed to monitor the toilet stalls and therefore did not invade or violate plaintiffs' expectation of privacy.

It is not disputed that the managers of the office building installed this surveillance equipment in 2003, ostensibly in response to complaints made by certain tenants of vandalism and damage to bathroom facilities. The scope and nature of the vandalism included both the area where the washbasins are located, as well as the toilet areas. Specifically, defendants allege tenants complained the toilets in these bathrooms were overflowing and being rendered unusable by unknown individuals intentionally or negligently placing paper towels or other obstructions into the toilet bowls to block or impede the flow of water. According to defendants, they installed the video surveillance equipment and concealed the cameras inside the

---

[1] Plaintiffs alleged that some of their children used the bathrooms when they visited on "Take Your Child to Work Day."

bathrooms' smoke detectors to deter this vandalism and gather evidence against the alleged vandals.

Although installed and made operational in 2003, defendants claimed the entire video surveillance equipment lay dormant and unused for four years. Defendants claimed the stealthy monitoring of the bathrooms began in 2007, and only functioned for three continuous days.

This monitoring operation came to an abrupt end only by sheer happenstance, when a tenant employee walked by a closet with a sign on the door that read: "Authorized Personnel Only." Although defendants intended the closet door to remain closed and locked at all times, that day the door was inadvertently left ajar. When the employee looked inside the closet, he discovered video monitors displaying a live video feed of the four bathrooms.

This employee immediately reported his discovery to the local police department. The responding police officers investigated the claim and confirmed the existence of the video surveillance operation, and disconnected the camera lenses concealed inside the smoke detectors. An investigator from the Bergen County Prosecutor's Office took custody of the computer equipment for further investigation. It is not disputed that

law enforcement authorities decided not to file criminal charges against anyone connected with the surveillance operation.

In these consolidated civil complaints, plaintiffs allege intentional and negligent infliction of emotional distress, common law invasion of privacy, and invasion of privacy under N.J.S.A. 2C:58D-1(b). Plaintiffs seek common law compensatory damages, punitive damages under the Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17, and statutory damages under N.J.S.A. 2C:58D-1(c). Plaintiffs argue the evidence permits a rational fact finder to infer that the camera lenses concealed inside the smoke detectors may have been positioned, at least part of the time, to monitor the toilet stalls -- areas of the bathrooms defendants conceded are private. However, even if this covert video surveillance operation was limited to the so-called common areas of the bathrooms, plaintiffs argue they still have a cognizable cause of action under these same theories of liability.

The Law Division granted defendants' motions for summary judgment and dismissed plaintiffs' cause of action as a matter of law. The motion judge accepted defendants' factual claims as to the nature and scope of the video surveillance operation, and found plaintiffs did not have a reasonable expectation of

privacy in the areas of the bathrooms outside the toilet stalls where the wash basins are ordinarily located.

In this appeal, plaintiffs argue the motion judge erred in accepting defendants' claims concerning the nature and scope of the surveillance operation because, from the evidence presented, a rational jury could reject defendants' claim and find in favor of plaintiffs' factual contention that the scope of the surveillance included the toilet stalls. Independent of this material factual dispute, plaintiffs argue that the motion judge erred, as a matter of law, by concluding plaintiffs did not have a reasonable expectation of privacy in the areas of the bathrooms outside the toilet stalls where the washbasins are located.

We agree with plaintiffs' argument and reverse the trial court's order dismissing the counts in their complaints grounded on invasion of privacy. The trial court erred in dismissing plaintiffs' complaints as a matter of law. Under these circumstances, a rational jury could find defendants' actions violated plaintiffs' reasonable expectations of privacy. These material issues of fact cannot be resolved through summary judgment. We affirm, however, the court's dismissal of plaintiffs' claims based on intentional and negligent infliction of emotional distress.

A-5397-10T2

In our view, a rational jury could find that shielding the cameras from detection by placing them inside facially innocuous, yet ubiquitous safety devices, such as smoke detectors, is more suggestive of a sinister voyeuristic purpose than a good faith reasonable attempt at combating vandalism. This plausible conclusion by a jury is further supported by defendants' decision to disregard the suggestions made by the Fair Lawn Police Department to place a sign on the bathroom doors alerting all who entered that the bathroom's so-called "common areas" were monitored by video cameras.

However, even assuming a good faith motive, a rational jury could find that the approach adopted by defendants here is per se unreasonable because: (1) the clandestine nature of the surveillance operation negated the deterrent effect defendants allegedly sought to create; (2) acts of vandalism to bathrooms do not justify the installation of a covert video surveillance system to monitor inherently private areas like bathrooms; (3) although all areas of a bathroom are deemed private, bathrooms intended to be used exclusively by women and girls are inherently more susceptible to invasion of privacy claims. Plaintiffs can present evidence to a jury that women and girls utilize public bathrooms, including areas outside the toilet stalls, with the reasonable expectation that their private

10                                                                A-5397-10T2

grooming activities will only be visible to fellow female users who may be present at the time; and (4) both men and women may have used the so-called quasi-public areas of the bathrooms to perform personal grooming or other private activities when no one else was visibly present that they would have otherwise refrained from performing even in the presence of members of their own gender.

Based on these plausible findings, plaintiffs may be entitled to compensatory relief under both common law principles of privacy and pursuant to the specific cause of action for invasion of privacy authorized by the Legislature under N.J.S.A. 2A:58D-1. Depending on whether the jury awards compensatory damages, plaintiffs have also presented sufficient evidence to preserve the right to seek an award of punitive damages in a bifurcated proceeding as required under the PDA.

Because the trial court dismissed plaintiffs' cases as a matter of law, we review all facts in the light most favorable to plaintiffs, including any inferences that may be drawn from the evidence presented. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); R. 4:46-2(c).

I

At all times relevant to this case plaintiffs Soliman and Avrin worked in an office building located on Route 208 in Fair

Lawn.  CaC plaintiffs were employees and parents of children who visited their parents on "Take Your Child to Work Day," at offices owned by defendants.  These children used the bathrooms while at the office building.  Although the bathrooms were locked, defendants provided keys to all tenants who in turn supplied them to their employees.

Route 208 Associates was the landlord of the building in 2003.  In response to plaintiffs' interrogatories, defendants gave the following explanation for their decision to install video recording equipment in the bathrooms:

> In 2003, in response to ongoing vandalism in both the men's and women's bathrooms located on the upper level of the building, surveillance cameras were installed in the bathrooms, although at that time were not wired or otherwise made operational.  Prior to the installation of those cameras, representatives of tenant, Maxell . . . had communicated complaints to the building management regarding the conditions in the restrooms <u>including complaints of paper being stuffed down toilets with resulting backup, overflow, etc</u>.  In addition to expending money for plumbing repairs, the defendant's building manager spoke with the <u>Fairlawn [sic] Police who suggested placing hidden cameras in the restrooms for the purpose of identifying who was going in and out, or putting "fake" cameras in the restrooms with a sign indicating the premises were under surveillance</u>.  The police department suggestions were communicated to . . . Maxell via email of May 28, 2003.  Although defendant's email asked Maxell what it would be comfortable with, Maxell's representative replied that

A-5397-10T2

they "do not need to even know what action you elect to take. . . ."

The incidents of vandalism subsided for some time, but then intensified in 2007 as evidenced by further emails from Maxell's representatives to building management and visa [sic] versa. In an effort to identify the vandals, the building managers arranged to make the cameras operation, which included the installation of a digital video recorder (DVR) and a monitor located in a maintenance closet. The cameras became functional on or about March 28 or 29, 2007 and then were observed by one or more employees of the buildings tenants who were passing the maintenance closet. These observations by employees of the buildings tenants resulted in calls to the Fairlawn [sic] Police Department who responded to the location on or about March 30, 2007. The Bergen County Prosecutor's Office subsequently took possession of the video monitor, DVR, and other equipment.

The surveillance cameras were positioned in such a way that although people could be seen entering or exiting the bathrooms and near the sink areas, they would not be observed at or in the stalls or at the urinals in the men's room. <u>It was expected that any images captured by the surveillance cameras would depict people entering and leaving the restroom areas</u>. The DVR that was recording the images from the surveillance cameras was confiscated by the Bergen County Prosecutor's Office who investigated the matter. Upon belief, no case was presented to a Grand Jury and the Prosecutor's Office decided not to pursue a prosecution against anyone. <u>The defendant has no knowledge that its employees stopped to view images on the video monitor nor reviewed any recorded images on the DVR</u>.

(Emphasis added).

Plaintiff Patricia Soliman submitted a certification in opposition to defendants' motion for summary judgment. Plaintiff's counsel used Ms. Soliman's certification in direct support of her personal claims and as representative of the type of privacy injury suffered by the women and girls who used these bathrooms:

> After learning about the discovery of the hidden cameras I felt that my rights had been violated and my privacy invaded.
>
> I no longer trusted the environment within the building, and in particular the bathrooms.
>
> I lived in Hawthorne at the time and after the discovery of the cameras, I would go home for lunch to use my bathroom and to the extent possible would "hold it in" throughout the day.
>
> I continue to this day to have psychological issues as a direct result of the discovery of the cameras, and continue to have difficulty trusting public places such as bathrooms and dressing rooms, as well as new environments such as hotel rooms.
>
> The location of the hidden devices within the bathrooms was in immediate proximity to the stalls.
>
> During the time I worked in the building, prior to the discovery of the cameras, I would use the restroom several times per day.
>
> During the time I worked in the building, prior to the discovery of the

A-5397-10T2

cameras, <u>I would on occasion change clothing in the sink areas of the bathroom, keeping on undergarments while changing outer layers</u>.

I consider being viewable in undergarments by members of the opposite sex to be a violation of my expectations of privacy.

Had I known I could be viewable by members of the opposite sex through cameras, I would never have changed in the bathrooms, and would have avoided use of the bathrooms completely.

(Emphasis added).

At her counsel's request, Soliman consulted with Dr. Peter Crain, a physician and diplomate of the American Board of Psychiatry and Neurology, and of the American Board of Forensic Psychiatry. Dr. Crain opined that Soliman did not trust restrooms and as a consequence suffers from anxiety. He diagnosed Soliman as suffering from "Specific Phobia to Public Restrooms." Because she avoided using the restroom at work and avoided eating and drinking during work hours, Soliman developed distention of the bladder, hypoglycemia, and anxiety; she also has difficulty with focusing. Despite Dr. Crain's evaluation and diagnosis, Soliman decided not to seek psychiatric treatment. She hoped that her anxieties and fear of public bathrooms would subside after she left her employment.

Avrin claimed her psychological injuries resulting from the incident on March 30, 2007, manifested in her developing an obsessive compulsive preoccupation or disorder with her privacy. These psychological factors, such as fear of public restrooms and difficulty sleeping, also affected her physical condition, causing ocular migraines. Although she claimed to have consulted with a physician, she did not supply a report or claims expenditures for medical care as a measure of damages.

However, Avrin also consulted with Dr. Crain on one occasion and rendered a report to document this medical/psychiatric intervention. She complained to Dr. Crain of waking during the night and suffering from two migraine headaches. Dr. Crain diagnosed Avrin as suffering from obsessive compulsive disorder and aggravation of pre-existing migraines due to stress. Dr. Crain submitted Avrin's evaluation less than two weeks after the incident. As was the case with Soliman, Avrin opted to defer any psychiatric treatment to see if her symptoms would improve on their own over time.

The CaC plaintiffs all provided similar accounts of their emotional trauma and medical experiences in their responses to defendants' interrogatories. The infant plaintiffs described their emotional injury in terms of "wounded sensibility." In

16

their capacity as guardians <u>ad litem</u>, the parents of the affected children alleged claims that included phobia of bathrooms, anxiety, embarrassment, emotional distress, humiliation, depression, anger, and nervousness. All of the parents also alleged experiencing anxiety when using public restrooms and all of the CaC plaintiffs invoked the statutory cause of action under <u>N.J.S.A.</u> 2A:58D-1 as a basis for liability for invasion of privacy.

Five CaC adult plaintiffs provided expert reports from psychologist Dr. Moti Peleg, who is also Board certified in traumatic stress and a diplomate of the American Board of Forensic Examiners and the American Academy of Pain Management.

Dr. Peleg diagnosed RF as suffering from generalized anxiety disorder. He noted, however, that Minnesota Multiphasic Personality Inventory (MMPI) psychological testing would be needed to determine if there was a causal connection between the incident, and to ascertain whether RF suffered from a pre-existing anxiety/panic condition and, if so, whether the pre-existing condition had been exacerbated by this incident.

With respect to AG, Dr. Peleg diagnosed her as suffering from generalized anxiety disorder, despite initially finding only mild forms of post-traumatic stress disorder (PTSD). Aside from fear of using public restrooms, Dr. Peleg opined that AG

did not report significant adverse effects on her life as a consequence of this incident. She did not complain of being depressed or anxious, and did not appear to be visibly traumatized.

In CB's case, Dr. Peleg's diagnosis included adjustment disorder with mixed emotional features. However, he did not relate this diagnosis to the incident at issue. Dr. Peleg did not find any indication of long term chronic symptoms due to the incident. Dr. Peleg diagnosed LT with generalized anxiety disorder and major depression. As was the case with RF, Dr. Peleg qualified his diagnosis by noting that further MMPI psychological testing was needed to rule out a pre-existing anxiety/panic condition. Finally, with respect to RC, Dr. Peleg diagnosed generalized anxiety disorder. He also noted that RC did not appear to have any significant long term chronic symptoms due to the incident.

II

We begin our analysis by reaffirming that we review the grant or denial of a motion for summary judgment de novo. Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013). We grant summary judgment only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). We must determine whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, supra, 142 N.J. at 540.

Applying this standard, we are satisfied that the record cannot support the dismissal of plaintiffs' cause of action as a matter of law. Before addressing directly the many material issues of fact in dispute, we will first delineate the legal bases of plaintiffs' claims.

A

Our Supreme Court has acknowledged that the right to privacy is "grounded" in the Fourteenth Amendment of the United States Constitution's concept of "personal liberty." John Doe v. Poritz, 142 N.J. 1, 77-78 (1995), (quoting Whalen v. Roe, 429 U.S. 589, 598 n.23, 599-600, 97 S. Ct. 869, 876 and n.23, 51 L. Ed. 2d 64 73 and n.23 (1977)). As expressed in the Fourteenth Amendment, "the right of privacy safeguards at least two different kinds of interests: 'the individual interest in avoiding disclosure of personal matters,' and 'the interest in

independence in making certain kinds of important decisions.'" Id. at 77 (internal citation omitted).

We recognize that the privacy rights characterized by the Court as "grounded" in the Fourteenth Amendment apply only in cases alleging unreasonable and intrusive action by a governmental actor. Ibid. Here, plaintiffs allege their right to privacy was violated by private actors, thus rendering inapplicable the Fourteenth Amendment's laudable protection. We nevertheless view the Fourteenth Amendment as a national expression of public policy, a moral compass to help us focus on the values that are at stake in this case.

By contrast, independent of the privacy rights conferred by the federal constitution against unreasonable searches or seizures by governmental actors, our Supreme Court has recognized "at least" two New Jersey-centric bases protecting the right to privacy: "the common law and article I, paragraph 1 of the New Jersey Constitution." Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 94 (1992). Our rights to privacy expressly provide New Jersey citizens with the legal means to seek redress against all those who seek to undermine or violate their privacy, regardless of their status as public or private actors.

The New Jersey Constitution provides:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness. N.J. Const. art. 1, par. 1.

The Court in John Doe v. Poritz, supra, 142 N.J. at 89, reaffirmed that this provision in our State's Constitution guarantees to all the right of privacy. We have enforced this constitutional right to privacy with equal vigor, finding it to encompass "'the right of an individual to be . . . protected from any wrongful intrusion into his [or her] private life which would outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'" Burnett v. County. of Bergen, 402 N.J. Super. 319, 332 (App Div. 2008), rev'd, in part, on other grounds, 198 N.J. 408 (2009) (quoting McGovern v. Van Riper, 137 N.J. Eq. 24, 32, 43 A.2d 514 (Ch. 1945), aff'd, 137 N.J. Eq. 548, 45 A.2d 842 (E. & A. 1946)).

As the Court noted in Hennessey, supra, the right to privacy is also recognized and protected under our common law as "the tort of intrusion on seclusion." 129 N.J. at 94. Adopting the legal principles reflected in the Restatement (Second) of Torts § 652B (1977), the Hennessey Court defined this privacy tort to impose civil liability on "'[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or

seclusion of another or his private affairs or concerns, [this individual would be] subject to liability to the other for invasion of his privacy, <u>if the intrusion would be highly offensive to a reasonable person</u>.'" <u>Id.</u> at 94-95 (emphasis added).

The comments section of the <u>Restatement</u> contains a number of scenarios or illustrations that, in the opinion of the commentators, show how to trigger liability under this tort. In our view, the following illustrations involve circumstances analogous to the salient facts alleged by plaintiffs here.

> A, a woman, is sick in a hospital with a rare disease that arouses public curiosity. B, a newspaper reporter, calls her on the telephone and asks for an interview, but she refuses to see him. B then goes to the hospital, enters A's room and over her objection takes her photograph. B has invaded A's privacy.
>
> [<u>Restatement (Second) of Torts</u> § 652B, comment B, illustration 1 (1977).]

> A, a young woman, attends a "Fun House," a public place of amusement where various tricks are played upon visitors. While she is there a concealed jet of compressed air blows her skirts over her head, and reveals her underwear. B takes a photograph of her in that position. B has invaded A's privacy.
>
> [<u>Restatement (Second) of Torts</u> § 652B, comment c, illustration 7 (1977).]

A-5397-10T2

In <u>Villanova v. Innovative Investigations</u>, 420 <u>N.J. Super.</u> 353, 360 (App. Div.), <u>certif. denied</u>, 208 <u>N.J.</u> 597 (2011), we were recently presented with the opportunity to reexamine the contours of the tort of invasion of privacy in the modern world of electronic surveillance. The plaintiff in <u>Villanova</u> sought to recover damages from a private investigator hired by his wife to investigate his "suspected infidelities." <u>Villanova</u>, <u>supra</u>, 420 <u>N.J. Super.</u> at 355. The defendant placed a concealed global positioning satellite (GPS) tracking device on the plaintiff's car without his knowledge or consent. <u>Ibid.</u>

We affirmed the trial court's decision granting the defendant's motion for summary judgment. <u>Id.</u> at 356. Writing for the panel, Judge Lisa explained that "the placement of a GPS device in [the] plaintiff's vehicle without his knowledge, but in the absence of evidence that he drove the vehicle into a private or secluded location that was out of public view and in which he had a legitimate expectation of privacy, does not constitute the tort of invasion of privacy." <u>Ibid.</u>

Our analytical approach to these types of cases has not wavered. "[O]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his [or her] private affairs or concerns, is subject to liability to the other for invasion of his [or her] privacy, <u>if the intrusion</u>

would be highly offensive to a reasonable person." <u>Figured v.</u> <u>Paralegal Tech. Serv.</u>, 231 <u>N.J. Super.</u> 251, 256 (App. Div. 1989), <u>appeal dismissed</u>, 121 <u>N.J.</u> 666 (1990) (quoting <u>Restatement (Second) of Torts</u> § 652B (1977)) (emphasis added).

Mindful of these legal standards, and based on our de novo review of the record presented to the trial court, we conclude that plaintiffs presented sufficient evidence to bring this matter before a jury. Here, defendants deployed a highly invasive, intentionally clandestine video surveillance system in bathrooms intended to serve the occupants and visitors of this office complex. This approach does not include, in our view, a plausible justification for concealing the video lens inside smoke detectors or explain why defendants did not place a sign, located at a conspicuous entry point of the bathrooms, alerting all who entered of the existence of surveillance equipment monitoring the so-called "common areas" of the bathrooms, as specifically suggested by the Fair Lawn Police Department.

Defendants allege that the surveillance equipment was installed and rendered operational in 2003; yet it lay dormant and unused for nearly four years. They further claim that the actual surveillance operation was short-lived, beginning on March 28, 2007, when High Tech Depot connected the cameras to a digital video recorder (DVR) and a monitor was placed in a

maintenance closet that had a locked door marked "Authorized Personnel Only." It operated for nearly three days until it was inadvertently discovered on March 30, 2007, when an employee who worked in the office building passed by the maintenance closet while the door was left ajar.

The record shows that both the affected employees and the building management called the Fair Lawn Police Department in response to this discovery. The former called the police to report what they in good faith believed to be a criminal act involving the violation of their right to privacy, possibly including evidence of a scheme involving child pornography; the latter called the police to remove "a news camera team" that was on site investigating the incident.

The Bergen County Prosecutor's Office conducted its own independent investigation and concluded that criminal prosecution was not warranted. It took possession of the monitor, DVR, and other surveillance equipment.

The property manager told police that the cameras were installed to monitor the restrooms due to vandalism problems and that they were strictly focused on the sink areas and did not provide a view of the stalls. Kushner defendants claimed that the cameras were positioned only to allow observation of persons at the sink areas.

Conversely, plaintiffs assert that the cameras were positioned so that they also provided observation of the stall areas. To support this claim, plaintiffs relied on Detective Jeffrey Welsh's statement on the third page of his supplemental investigation report that stated: "the video monitor displayed the 4 bathrooms showing the sink and bathroom stall areas." Kushner defendants denied the cameras were ever positioned to monitor the toilet stalls. In rebuttal, defendants cite to Police Officer Michael Franco's report, where he stated that for all four restrooms, two male and two female, "there was no view into the stalls, only the sink area."

Exercising our de novo review, we conclude a rational jury is free to reject, as a matter of credibility, defendants' assertion that the surveillance equipment was not used immediately after it became operational in 2003. A jury could find defendants' account in this respect as merely reflective of a self-serving, post-discovery strategy to mitigate damages. Jurors may also accept Detective Jeffrey Welsh's statement that the video monitor displayed images of "the sink and bathroom stall areas." If this plausible outcome is accepted by a jury, it will satisfy plaintiffs' burden of proof as to liability under the common law, that the intrusion involved here "'would be highly offensive to a reasonable person.'" Hennessey, supra,

129 N.J. at 95 (quoting Restatement (Second) of Torts § 652B (1977)).

In Rumbauskas v. Cantor, the Court was asked to determine "whether the tort of intrusion on seclusion is an 'injury to the person' barred by the two-year limitation period set forth in N.J.S.A. 2A:14-2 or is an 'injury to the rights of another' barred by the six-year limitation period set forth in N.J.S.A. 2A:14-1." 138 N.J. 173, 175 (1995). The controversy in Rumbauskas arose from what Justice O'Hern characterized as "[a]n innocuous rivalry between two suitors of a woman . . ." Ibid. However, what began as "mere harassment" between "suitors" eventually "escalated into stalkings and threats to kill." Ibid.

In addition to whatever involvement the parties had with the criminal justice system, the plaintiff in Rumbauskas filed a civil action seeking monetary damages for invasion of privacy. Id. at 176-77. In addressing the central legal question raised in the appeal, i.e., what statute of limitation applies to a cause of action grounded in the tort of invasion of privacy, the Court noted it had previously cited with approval[2] the Law

---

[2] This was a reference to Montells v. Haynes, 133 N.J. 282, 292 (1993), in which the Court held that the two-year statute of limitations in N.J.S.A. 2A:14-2 applied to a cause of action
(continued)

Division decision in Canessa v. J.I. Kislak, Inc., 97 N.J. Super. 327 (Law Div. 1967), "which held that the six-year statute of limitations applied to an invasion-of-privacy claim." Id. at 178.

Faced with this seemingly analytical paradox, the Court noted that the tort of invasion of privacy in Canessa was limited to the unauthorized, misappropriation and use of the plaintiff's photograph or likeness to advance the defendant's commercial interest. Rumbauskas, supra, 138 N.J. at 179. Under those circumstances, and after "analyzing numerous cases attempting to clarify the concept of the tort of invasion of privacy," the Law Division in Canessa concluded

> Entirely apart, however, from the metaphysical niceties, the reality of a case such as we have here is, in the court's opinion, simply this: plaintiffs' names and likenesses belong to them. As such they are property. They are things of value. Defendant has made them so, for it has taken them for its own commercial benefit.
>
> [Ibid. (quoting Canessa, 97 N.J. Super. at 351) (emphasis added).]

The Court in Rumbauskas ultimately concluded that "the problem" with considering the holding in Canessa as an

---

(continued)
brought under the Law Against Discrimination (LAD), N.J.S.A. 10:5-13. Rumbauskas, supra, 138 N.J. at 178-79.

analytical paradigm was that the common law tort of invasion of privacy

> is not one tort, but a complex of four. The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common <u>except that each represents an interference with the right of the plaintiff to be let alone</u>.
>
> [<u>Rumbauskas</u>, <u>supra</u>, 138 <u>N.J.</u> at 179. (internal citation omitted) (emphasis added).]

In reaching this conclusion, the Court adopted the approach endorsed by the Law Division in <u>Canessa</u>, <u>supra</u>, 97 <u>N.J. Super.</u> at 33, as first articulated by William L. Prosser, in "The Law of Torts," § 112 (3rd ed. 1964):

> The four classifications that Dean Prosser propounded are: (1) intrusion (<u>e.q.</u>, intrusion on plaintiff's physical solitude or seclusion, as by invading his or her home, illegally searching, eavesdropping, or prying into personal affairs); (2) public disclosure of private facts (<u>e.q.</u>, making public private information about plaintiff); (3) placing plaintiff in a false light in the public eye (which need not be defamatory, but must be something that would be objectionable to the ordinary reasonable person); and (4) appropriation, for the defendant's benefit, of the plaintiff's name or likeness.
>
> [<u>Rumbauskas</u>, <u>supra</u>, 138 <u>N.J.</u> at 179 (citing W. Page Keeton, et al., <u>Prosser and Keeton on the Law of Torts</u> § 117 (5th ed. 1984)).]

Based on plaintiffs' factual contentions, the privacy interest at stake here is freedom from "intrusion" or prying into inherently non-public areas where there is a reasonable gender-specific expectation of privacy. In this context, the tort of invasion of privacy "is simply that [the] defendant's conduct struck directly at the personhood of [the] plaintiff." Id. at 182. Comparing this injury to "the claim in Montells, supra, 133 N.J. at 293," (an action brought by the plaintiff under the LAD seeking compensatory damages for sexual harassment and hostile work environment), the Court in Rumbauskas noted that the "defendant's conduct 'cuts most deeply at the personal level.'" Ibid.

In comparing the injuries suffered by a plaintiff in an LAD action alleging sexual discrimination in the work place with the injuries or damages associated with or recoverable by a plaintiff in an action grounded in the common law tort of invasion of privacy, the Court in Rumbauskas cited to the following passage from Montells, in which the Court noted the Legislature's then recent amendments to the LAD specifying the "harm suffered by both the people and the State from the 'personal hardships' caused by discrimination[.]" Montells, supra, 133 N.J. at 287 (emphasis added). These amendments to the LAD clarified the meaning and expanded the scope of the type

of "personal hardships" suffered by those who experience invidious discrimination in the work place.

> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this act. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.

> [N.J.S.A. 10:5-3.]

In our view, and most importantly consistent with the Court's own views in Rumbauskas, supra, 138 N.J. at 179, plaintiffs who have experienced a violation of their personal privacy may have endured many of these same "personal hardships." We thus hold that a plaintiff in a cause of action predicated on the tort of invasion of privacy, grounded in the subcategory of "invasion of intrusion on [the] plaintiff's physical solitude or seclusion," which include the

characteristics of unconsented prying, may recover compensatory damages for "personal hardships," similar in kind and scope to those codified in N.J.S.A. 10:5-3, if plaintiffs can show a causal link between defendants' intrusion and these "personal hardships." As a threshold issue, plaintiffs must show in these consolidated cases that defendants' actions to clandestinely monitor their activities in a gender-restricted bathroom is subject to liability, because it is the type of intrusion that a reasonable person would find to be highly offensive.

Depending on the availability of compensatory damages, we are equally satisfied that this same evidence may support an award of punitive damages under the PDA's definition of "actual malice." N.J.S.A. 2A:15-5.10.

B

Plaintiffs also asserted invasion of privacy claims under N.J.S.A. 2A:58D-1a, which provides:

> An actor who, without license or privilege to do so, photographs, films, videotapes, records, or otherwise reproduces in any manner, the image of another person whose intimate parts are exposed or who is engaged in an act of sexual penetration or sexual contact, without that person's consent and under circumstances in which a reasonable person would not expect to be observed, shall be liable to that person, who may bring a civil action in the Superior Court.
>
> [(Emphasis added).]

A-5397-10T2

Alternatively, plaintiffs assert a claim under <u>N.J.S.A.</u> 2A:58D-1b, which provides:

> An actor who, without license or privilege to do so, <u>discloses any</u> photograph, film, <u>videotape</u>, recording or any other reproduction of the image of another person whose intimate parts are exposed or who is engaged in an act of sexual penetration or sexual contact, without that person's consent and under circumstances in which a reasonable person would not expect to be observed, shall be liable to that person, who may bring a civil action in the Superior Court. For purposes of this section, "disclose" means sell, manufacture, give, provide, lend, trade, mail, deliver, transfer, publish, distribute, circulate, disseminate, present, exhibit, advertise or offer.

In terms of damages, the statute specifically authorizes the court to award:

> (1) actual damages, but not less than liquidated damages computed at the rate of $1,000.00 for each violation of this act;
>
> (2) punitive damages upon proof of willful or reckless disregard of the law;
>
> (3) reasonable attorney's fees and other litigation costs reasonably incurred; and
>
> (4) such other preliminary and equitable relief as the court determines to be appropriate.
>
> [<u>N.J.S.A.</u> 2A:58D-1c.]

In our view, the same record discussed at length during our analysis of the evolution of the tort of invasion of privacy

under the common law renders plaintiffs' cause of action under this statute not suitable to summary judgment disposition. Without belaboring the issue, a reasonable jury could find that defendants' clandestine video surveillance equipment captured images of plaintiffs performing personal grooming or biological activities that exposed their intimate parts.

In response to plaintiffs' interrogatories, defendants conceded that the surveillance operation was conceived and installed in response to "complaints of paper being stuffed down toilets with resulting backup, overflow." A jury is entitled to infer from this admission that the cameras' monitoring scope included surveillance of the toilet stalls in order to identify the individual or individuals engaging in this alleged vandalism. This plausible finding is further corroborated by a supplemental investigation report prepared by Fair Lawn Police Detective Jeffrey Welsh, in which he stated: "the video monitor displayed the 4 bathrooms showing the sink and bathroom stall areas."

Finally, we affirm the trial court's dismissal of plaintiffs' claims of intentional and negligent infliction of emotional distress. To make out a prima facie case of intentional infliction of emotional distress, a plaintiff must show that: (1) the defendant acted intentionally; (2) the

defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community;" (3) the defendant's actions proximately caused him/her emotional distress; and (4) the emotional distress was "so severe that no reasonable [person] could be expected to endure it." Segal v. Lynch, 413 N.J. Super. 171, 191 (App. Div. 2010) (quoting Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 366 (1988)). Here, the trial court correctly found the record does not contain sufficient evidence for a rational jury to find a legal basis to hold defendants accountable on this standard of liability.

We reach a similar conclusion with respect to the tort of negligent infliction of emotional distress. This tort is intended to compensate those who witness "shocking events that do not occur in the daily lives of most people." Frame v. Kothari, 115 N.J. 638, 644 (1989). Events or circumstances that have been found to present cognizable claims under this tort include bystanders to accidents, Portee v. Jaffee, 84 N.J. 88 (1980); medical malpractice committed in the presence of the plaintiff, Kothari, supra, 115 N.J. at 640; Strachan v. John F. Kennedy Memorial Hospital, 109 N.J. 523 (1988); or cases involving loss of a corpse, Muniz v. United Hospitals Medical

Center Presbyterian Hospital, 153 N.J. Super. 79 (App. Div. 1977). The evidence described at length here does not constitute this type of trauma.

To summarize, we are satisfied that the evidence presented is sufficient to withstand defendants' summary judgment challenge on the claims grounded on the tort of invasion of privacy. We thus reverse and remand this matter for trial before a jury on this issue. The judgment of the trial court is otherwise affirmed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5397-10T2